1. Where there is conflicting evidence as to testamentary capacity to make a will, and sufficient evidence to establish the absence of testamentary *Page 769 
capacity, the verdict of the jury finding in favor of the caveat will not be set aside on the ground that there is a lack of evidence to support the verdict.
2. A written document previously made and signed by a witness, which is contrary to his testimony, may be introduced in evidence for the purpose of impeachment on the ground of contradictory statements; and this may be done notwithstanding the witness admits signing the document, and testifies that most of the statements contained therein are false, where the document contains other statements whose falsity is not admitted.
3. Where a written document containing a past history of the testator is admitted in evidence, though afterwards ruled out, and while in evidence an expert witness bases an opinion, partly upon the contents of the document, and where the trial judge thereafter, in ruling out the document, also ruled out all evidence in reference thereto, such instructions to the jury were amply sufficient to withdraw from them any testimony as to an opinion based on the contents of the document.
4. In a contest over a will where the caveat is based upon mental incapacity, it is not error to refuse a timely request to charge that a person would be competent to make a will, unless he is "totally deprived of reason and understanding," where the court charged: "A person has testamentary capacity, . . who understands the nature of a will, namely, that it is a disposition of property to take effect after death, and who is capable of remembering generally the nature and value of the property subject to his disposition, and the persons related to him by ties of blood and affection, and who is capable also of conceiving and expressing an intelligent [intelligible?] scheme for the disposition of his property. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will be sufficient."
5, 6. There was no error in the action of the trial judge, as alleged in grounds seven and eight of the motion for new trial.
7. Where a witness, upon direct examination, gives testimony to which no objection is interposed, and subsequently, on cross-examination, his testimony indicates that what he testified on direct examination was illegal, an objection to the evidence given on cross-examination, without a motion to rule out that given on direct examination, was not sufficient to reach the testimony previously given on direct examination.
8. Where a caveator admits a prima facie case and assumes the burden of proof, he is not precluded from introducing evidence as to the conduct of the testatrix at the time the will was executed.
(a) An attorney at law may testify as a witness with respect to essential facts attending the execution of a will.
9. The overruling of an objection to evidence on the sole ground that it is irrelevant is not reversible error.
10. The exception to the portion of the charge alleging it to be an expression of opinion by the court, is without merit.
 No. 14823. MAY 3, 1944. REHEARING DENIED JUNE 9, 1944. *Page 770 
Mrs. Elizabeth H. Combs died leaving an alleged will, which George T. Manley, the executor and principal legatee, offered for probate. W. B. Combs, the husband and sole heir at law of the testatrix, had been adjudged incompetent, and a caveat to the will was filed by Mrs. Sarah C. Johnson as his guardian. The sole issue submitted to the jury was the question of the competency of the testatrix to make a will. The jury found in favor of the caveat.
The will was executed on May 10, 1935. The testatrix died in 1942. At the time the will was executed she was approximately sixty-five years of age, had been married three times and divorced from her first two husbands, and was living separate from her third husband. She had no children.
A summary of the evidence relied upon to sustain the caveat may be more easily understood by prefixing to it the following statement: On October 28, 1935, forty-eight days after the execution of the will, the testatrix was adjudged insane by the court of ordinary of Bibb County, was sent to the Georgia State Hospital at Milledgeville, and remained there until her death in 1942.
R. G. Flynt testified: Mrs. Elizabeth Combs was his aunt, his mother's sister. He knew her all his life. After she married Mr. Combs, the witness was acquainted with him since 1913. Mr. Combs left her some time between 1925 and 1930. Since then she stayed at her home on Vineville Avenue. Had part of the house rented at times. During the five or six years before she was adjudicated insane, he had occasion to see her. He noticed something unusual about her condition. She did a lot of funny things. She would call him up there, possibly would go into hysterics, possibly be half-clothed, with nothing on but a gown. It came along gradually; it looked like it kept getting worse and worse. She was hard to get along with. She didn't get down to the subject at all on what she wanted to talk about. She would call him out there for one thing, and would forget about it and talk about something else — just jumped from one thing to the other. He knew that she lost her mind. She would have crying spells. She continued in this condition after she was sent to Milledgeville. He saw her at times during the summer and early fall of 1935. She had been *Page 771 
bad for a long time. Lots of times when he would go out there she would not even be dressed — just have on a gown — come out in the front wearing a gown. When he would leave, she would go into hysterics, and would never know what she called him for. At the trial of a suit in Bibb superior court in 1934 between Mrs. Combs and Mr. Combs, involving the ownership of the dwelling on Vineville Avenue, the witness, who was also a witness in that suit, testified that she pulled her chair up, and to his replies to every question she would say: "That is a lie; it is a lie; it is a lie." Mrs. Combs was insane when she tried those other cases; her mind was not good. She was a person of highly nervous temperament. was easily upset, would go off into tantrums or emotional disturbances of different kinds. As to money, that was her main trouble. She looked after her property pretty well, and tried to get the best out of it. She moved down into a basement room in her house in order to rent all of the house. That was one reason why he thought she was crazy. No sensible person would have done that. It was nothing but a nasty, filthy place. The furniture down there was rotten. She didn't have any income except from two pieces of property. She did take in sewing. When she settled the case with her husband she borrowed the money on the Vineville Avenue house. That was in the latter part of 1934. She dealt with people in a business way, arranged about rents, and looked after her affairs generally. After he testified against her in the suit with her husband, her manner towards him did not change. She called him several times to come out there and talk to her. Shortly before she was adjudged insane, she was taken sick. Mrs. Flynt, mother of the witness, stayed with her for about two weeks. She had been ill for some time. The witness had her sent to the Middle Georgia Hospital, where she stayed about ten days before being sent to the Georgia State Hospital at Milledgeville.
Mrs. S. G. Ryle testified: She lived at 1311 Vineville Avenue next door to Mrs. Combs; had lived next door to her for twenty years, and saw her frequently. She was practically a mother to the witness; was a wonderful manager. The witness noticed a change in her mental condition as the years went by. This change took place about twelve or fifteen years before she finally went to Milledgeville; about four or five years after Mr. Combs lost his position *Page 772 
with the railroad. Soon after he lost his position the shock of it affected her. She never was the same any more. As to what manifestations or signs she gave of being abnormal, she seemed to think everybody was trying to steal from her. Then she was very emotional, and seemed to want to scandalize some one, like she just wanted to get something against them. She would watch the girls in the neighborhood; would sit out and see what boys came in at night. Mrs. Sarah C. Johnson, her stepdaughter, lived, when a girl, with Mr. and Mrs. Combs, but left before Mr. Combs did. She mistreated the girl a great deal. She had hot water in the house, but refused to allow the girl to draw her a tub of water; made her heat it in the basement and bring it up the steps. By the time she got one pail heated and came up with the next, it would be cold. She kept that child running up and down the steps. She would curse the child because she would not bring the water up. A year or two before she went to Milledgeville, there was something unusual in the way she dressed. She would wear a nightgown, sometimes not that — just wrapped a sheet around her. "She would come outdoors that way, on the sidewalk, put a chair on the sidewalk, in the middle of the house, sit rocking for hours, people would have to walk around her chair to get past her." She used profanity in the worst form — very vile language. She got to using bad language in the last few years. She thought a lot of the witness's baby child, whom she had at her house often until she got the idea everybody was going to steal from her. "As to how many times I would say that I saw her take a rocking chair and sit on the front sidewalk and wrap a sheet around her. I don't know how many times. She would do that practically every day for a week, then there would be several weeks I hardly ever saw her at all. . . She would sit on the front porch in the swing and in the front yard in a chair in the same condition quite often. . . That was summer before she was sent off, in the late summer or early fall. I never saw her do that before that time." Her manner changed after Mr. Combs lost his job; she seemed to get bitter. After he lost his job, they had a rather hard time financially. She said that he made $300 a month, and gave her $150, which was used to make payments on the house, and that he banked his. When he lost his job, she found out that he had not banked his money, but had started a business, a little machine shop. It made her *Page 773 
angry, and she closed the doors and ordered the machinists off; locked the doors and made them get out. Mrs. Combs drank. She had a bootlegger who brought liquor there all the time. She had been living down there in the basement a year before she became sick. She had no other source of income except what she received from her property. "As to whether I think she acted rather sensibly in making that sacrifice of her own comfort in order to get a better revenue from the property, well she had quite a bit of good judgment in lots of ways, in a business way, up until the very last. I would say she could manage in a business way, but that was the only thing; her whole heart was on money. She loved money better than anything in the world. She could manage money to the last. As to whether she put a good value on her property if she loved money, I don't know if she did, she didn't charge enough rent."
Sam G. Ryle testified: He lived next door to Mrs. Combs about twenty years. In about 1926 or 1927 she took a liking to their baby, a grown woman now; called the baby over to her house a great deal, and taught her things about cooking. She kept getting to talking at random and using bad language, and he stopped his daughter from going there. She came to his house and used bad language before the children. A year or two before she was sent to Milledgeville, she got out on the sidewalk in a chair in a nightgown, split half way up to her knee or above her knees, and sat there for half an hour or three-quarters at 12 o'clock in the day. All the neighbors saw that. She used plenty of profanity whenever she got to talking. "I mean by talking at random, she would say a thing, then in a few minutes she would contradict probably what she had said, said she didn't say that. . . In other words, she would threaten and do every kind of — she would say all kinds of things, go into a sort of tantrum, . . so I went to walking out."
Mrs. Sarah C. Johnson testified: She is a stepdaughter of the testatrix. Her father married the testatrix in 1909. At that time the witness was nine years old. She lived with the testatrix from 1909 to 1928; left home because she was afraid of the testatrix, who had slipped up from behind and hit her. As a young lady, when she would have dates with boys on the front porch, the testatrix would eavesdrop, slip around in the front room in night *Page 774 
clothes and get behind a glass door. She was always cruel to the witness, and used to beat her. Mr. Combs, her father, was master mechanic for a railroad, but left that job about 1925. After leaving the railroad he had other jobs, but did not make as much money. That changed conditions out there at the house. Mrs. Combs became worse. After leaving, the witness moved to Milledgeville and got a job with the Georgia State Hospital. Her father, after leaving Mrs. Combs, came and lived with her in 1931. Mrs. Combs came there once about 1933, and fussed with her father over the back fence. She accused him of having a woman at the witness's house, and said there was a woman in the house. No one was there but the colored woman who worked at the house. Before the witness left home, Mrs. Combs was always accusing her father of running around with women. The witness could tell the difference between normal people and Mrs. Combs. She acted peculiarly at times. She would accuse people of taking things. Before leaving home in 1928, the witness first noticed a change in the mental condition of the testatrix when her father left the railroad; and the testatrix got worse as time went on. She used profanity very much. As to how she indicated she was getting worse, she fussed more and was more cruel. She was hysterical, very easily thrown into a paroxysm of hysterics. When she started weeping, she could not say anything, she would just be overcome. The differences between Mr. and Mrs. Combs was usually over money — she wanted all the money. "So far as I know, at that time she understood about her business affairs. She was renting out some of the house, . . one side of it. She . . [occupied] the other side. She collected the rents . . and . . made arrangements with the tenants. . . She always looked after her business. She did that even when my father was here."
S. Gus Jones testified: He was a practicing lawyer at Macon. He prepared the will now under consideration at the instance of George T. Manley, the principal legatee and nominated executor. About a year earlier, he had prepared another will for Mrs. Combs. The wills were about the same except that the previous will had nominated a neighbor as principal legatee. It was practically a question of redrawing the same will and changing the name. It was drawn after Mrs. Combs and Mr. Manley came into the office. She gave him the facts upon which to draw the will. She read the will and *Page 775 
approved it before signing. "As to what she said, if anything about this dollar bequest to her husband, as to why she put it in there, and why I put it in there, . . it was in there because she said she wanted to cut him off; it was her idea . . to disinherit him." Previously, on the same day, Mr. Manley said that his aunt wanted to make a new will. As to what changes he asked to be made in the will, he said Mrs. Combs wanted to name him as beneficiary. "You ask me if while Mrs. Combs was in my office she did anything that was unusual. I answer, Mrs. Combs did do something that raised some doubt in my mind, and I was faced with the situation that lawyers are. She seemed to have an idea for a minute that there — she referred to some satchels and said, where are they? Said she had some satchels full of money. and was looking back of the chairs around in my office. I thought it was a peculiar place for a person to look for money. She had not brought any money satchels in there, no, no. . . She was peculiar to me; I was not satisfied that she was of sound mind, but this is the way I look at it: if I had not drawn the will, . . it would go by inheritance. . . There is no possibility for that to be . . presented in any court, . . but if there is a will drawn, then that can be questioned and then this court and jury. and not me, pass on it. . . As to whether I say that I believed at that time she was mentally incompetent, I say in my judgment there was a serious doubt about her competency." He saw the will executed, but was not a subscribing witness.
Dr. W. A. Williams testified: He was a practicing physician. About October 20, 1935, he was called to see Mrs. Combs. She was critically ill, had high fever, and was unconscious. He moved her to the Middle Georgia Hospital. Had never seen her before then. Dr. T. E. Rogers had been her former physician. "After I had had a chance to look at her for a day or so, she had acute pyelitis and extreme toxemia and [was] mentally incompetent, . . I determined her mental condition to be that she was incompetent. . . It probably was a dementia praecox. . . Her physical condition improved. . . Her fever came down to normal, and the condition of pyelitis was greatly improved. Pyelitis is a kind of infection of the kidneys. . . Her mental condition did not improve. . . What appeared . . to be . . a purely toxic thing from uremia, when that improved, her mental *Page 776 
condition didn't improve. . . I couldn't say from the condition that I saw Mrs. Combs in at the time I was treating her, that she might not have been herself mentally, and been able to understand ordinary affairs in a normal way a month before that time."
On October 28, 1935, at the instance of George T. Manley, the court of ordinary of Bibb County adjudged Mrs. Combs to be a lunatic, and committed her to the Georgia State Hospital at Milledgeville.
Dr. J. I. Garrard testified: That he was a physician, and had been with the Georgia State Hospital at Milledgeville thirty-three years. He examined Mrs. Combs shortly after she entered that institution. She had an organic brain condition, cerebral arteriosclerosis, meaning hardening of the arteries of the brain. She was disoriented, meaning she didn't know where she was. "As to whether I would classify her as sane or insane, I would classify arteriosclerotic and psychotic, that is the way we diagnose them, psychosis with arteriosclerosis. As to whether in the language of you laymen that would be sane or insane, we would term it insane; it is a psychosis. As to whether I would say she was sane or insane on September 10, 1935, fifty days earlier, with the information given me, my opinion is that she was abnormal, she may have had a lucid interval."
1. Only the evidence to sustain the caveat is here set forth, but the record contains evidence produced by the propounder from many sources to rebut the foregoing, and to establish that the testatrix was mentally competent to have a decided and rational desire as to the disposition of her property. The evidence, however, was sufficient to sustain the caveat, which was based on lack of testamentary capacity. Where there is conflicting evidence as to testamentary capacity to make a will, and sufficient evidence as to establish the absence of testamentary capacity, a verdict in favor of the caveat will not be set aside.
2. By the fourth ground of the motion for new trial error is alleged in the admission in evidence, for the purpose of impeachment, of a written document which contained certain data relative to the past history of the testatrix, and which was required for the *Page 777 
acceptance of a patient in the Georgia State Hospital at Milledgeville. George T. Manley, the propounder and principal legatee under the will, had testified to a long period of acquaintance, and a series of various transactions with the testatrix, and state: "I never at any time heard her say or do anything that indicated that her mind was not right, or that she didn't understand the things she was talking about, never in my life;" also: "As to what was the condition of her mind then, at the time she went over to Milledgeville, her mind had never been affected, so far as I know." When the document above referred to was presented to the witness, he admitted that it was in his handwriting and that he was one of the signers. This document gave the past history of the testatrix, in substance as follows: Name, age, nearest relative, extent of education? Does not have average intelligence; made success in business; kind disposition before insanity; never recovered from serious illness in 1933; lost mind then; not addicted to alcohol or drug habit; never insane before, present attack 1934; threatened to kill; kept pistol in possession, also knife; throws chair; goes without clothes; curses aloud; threatens to kill self; pistol taken from her; threatens to burn house; talks out of head; unable to know where she is; curses sisters all the time; hears noises and smells odors all the time; bedridden; under care of doctors in Macon and Atlanta; in bad fix both mental and physical; her mind is bad; and thinks some one is breaking in to kill her. Upon being questioned as to whether he signed this document, the witness admitted that he did, and sought to explain that it was done at the request of his mother and his aunt, who supplied the information therein, and that the paper did not contain any information representing his knowledge or opinion. He was questioned about most, but not all, of the statements contained therein, and denied that such statements were true. The document was admitted in evidence over the following objection of the propounder: "I don't think it is admissible for impeachment because he admits signing it; he simply explains why he signed it, and the circumstances; it does not contradict anything he said." This evidence was admissible for the purpose of impeaching the witness by showing contradictory statements. Code, § 38-1803.
In the brief of counsel for the plaintiff in error it is insisted that the document was inadmissible because the witness had admitted *Page 778 
signing it, and had enumerated all the statements contained therein, and therefore the document itself should have been excluded. As stated above, the objection could not be construed as raising this question before the trial judge. Moreover, upon an examination of the document and of the witness's testimony in reference thereto, it will be found that there were some statements in the document which were not covered by his testimony.
3. Ground five alleges error upon another phase of the document containing certain past history of the testatrix, being the same document referred to in the second division of this opinion. In the early stages of the trial the court, over the objection of counsel for the movant, admitted this document as evidence to be considered in passing on the testamentary capacity of the testatrix. Subsequently, the judge ruled it out and instructed the jury not to consider it, though it was afterwards admitted solely for the purpose of impeachment. When the document was originally put in evidence, and before it was withdrawn therefrom by the court, Dr. J. I. Garrard was allowed to testify as to his opinion of the testatrix's mental condition, based upon his own observations, and the history furnished by the family as contained in this document. The movant contends that, even though the document was withdrawn from evidence, he was injured and prejudiced because the opinion testified to by Dr. Garrard had been partly based upon the history of the testatrix contained in the paper. We can not agree with this contention. After ruling out the document, the judge instructed the jury as follows: "Gentlemen of the jury, give me your attention for just a moment. Yesterday I admitted into evidence what was termed, in speaking of it, as a history that was used in connection with an inquisition of lunacy — the trial in the court of ordinary of Mrs. Combs. This history blank that I am speaking of is the one that the propounder, Mr. Manley, stated here on the stand that he signed. I am withdrawing that, gentlemen, from evidence and from your consideration. I am likewise withdrawing any statements made on direct or cross-examination by Dr. Garrard — you will remember the physician that came over here from the Georgia State Hospital at Milledgeville and was on the stand — where he made any reference to that history blank or quoted from it or read from it or made any statements about the contents of it. Gentlemen, now those pieces of evidence that were *Page 779 
introduced here and admitted at the time by the court, are now excluded and are not in evidence — you will not let them have any weight upon you whatsoever in arriving at a verdict in this case. You will consider them or this evidence as if it had not been introduced at all." These instructions were amply sufficient to withdraw from the jury any opinion that the witness had given which was based on the contents of this document. Miller v.Everett, 192 Ga. 26 (5) (14 S.E.2d 449).
4. Ground six alleges error in the refusal of the court, upon timely written request, to charge as follows: "All persons of lawful age, except idiots, lunatics and those who are totallydeprived of reason and understanding, and except those who are acting under undue influence, are competent to make wills disposing of their property as they choose, be their understanding ever so weak. Courts and juries in passing on a will, do not undertake to measure the extent of the testator's mind, for if he is not totally deprived of reason, whether he be wise or unwise, he is the lawful disposer of his own property." The court charged all of the Code, § 113-202, defining testamentary capacity, and charged §§ 113-204 and 113-205, and in addition thereto charged as follows: "A person has testamentary capacity, gentlemen, who understands the nature of a will, namely, that it is a disposition of property to take effect after death, and who is capable of remembering generally the nature and value of the property subject to his disposition, and the persons related to him by ties of blood and affection, and who is capable also of conceiving and expressing an intelligent [intelligible?] scheme for the disposition of his property. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will be sufficient." This definition of testamentary capacity has been many times cited and approved. Slaughter v. Heath, 127 Ga. 747
(1-3) (57 S.E. 69, 27 L.R.A. (N.S.) 1); McFarland v.Morrison, 144 Ga. 63 (2) (86 S.E. 227); Davis v.Frederick, 155 Ga. 809 (2) (118 S.E. 206); May v. May,175 Ga. 693 (2) (165 S.E. 617); Griffin v. Barrett,183 Ga. 152, 164 (187 S.E. 828); Morgan v. Bell, 189 Ga. 432,435 (5 S.E.2d 897).
The plaintiff in error relies on Morris v. Stokes,21 Ga. 552, 571, to sustain his position; but that case has been explained, and the *Page 780 
exact question here raised decided adversely to his contentions in Slaughter v. Heath, supra.
5. There was no error in the action of the trial judge, as alleged in the seventh ground of the motion, where it appeared that during the cross-examination of the propounder, counsel requested the court to have the witness answer his questions without testifying as to extraneous matters, and the court stated: "I will have to restrict him in replying to [counsel's] questions, and ask him not to go into any other matters that are not explanatory of his answer."
6. The eighth ground is based upon an occurrence during the cross-examination of the propounder. Counsel had propounded a question, to which the witness made an extraneous reply, concluding with a statement to counsel: "Not only that, but you told me in Knoxville, Tennessee, he was not paying you for this, you were going to get yours out of the house and lot," to which counsel replied: "That statement is not true." The court interposed as follows: "You are a witness and you are bound to answer the questions, if you can; if you can not, just say so. I am not going to permit any argument between you and counsel. I shall want you to respect that now. Proceed." The statement of the court was proper. Moreover, no ruling of the court was invoked in reference to the statement made by counsel to the witness, and therefore no question is presented for decision by this court.
7. The ninth ground alleges error in a ruling upon evidence. In support of the caveat, Dr. W. A. Williams, on direct examination, testified: "As to the particular form of mental ailment, we made a diagnosis that it probably was a dementia praecox. As to what form of insanity dementia praecox is, it is . . where a person is threatening people, disoriented with themselves, and it persists where they are dangerous to themselves or other people, it is called that." Subsequently, on cross-examination, the witness testified: "I don't recall any . . statement from her . . that indicated she had made any threats to kill herself or anybody else . . and I don't recall what made me insert the words `dementia praecox' in this little diagnostic card. . . It might have been entirely from information given me by some third person." Q. "You don't know . . that you based . . your diagnosis on your own observation or conversation with Mrs. Combs?" A. "No, sir." The motion states that following this *Page 781 
testimony on cross-examination, "Movant's counsel objected to said evidence upon the ground Dr. Williams admitted . . that he could not say he got any information on his own observation on which said testimony could be based." The objection here made was not sufficient to reach the evidence previously given on direct examination, no objection to which is disclosed by the record. In order to question the legality of the evidence previously given on direct examination, counsel should have made a motion to rule out such testimony. The "objection" above quoted was not equivalent to a motion to rule out. Brown v. Oattis, 55 Ga. 416
(2); Kehoe v. Hanley, 95 Ga. 321 (22 S.E. 539);Fluker v. State, 184 Ga. 809 (4) (193 S.E. 749).
8. The tenth ground alleges error in the admission of the testimony of S. Gus Jones, the attorney who prepared the will, who was present at its execution, and who testified as to certain conduct of the testatrix at the time of such execution. There had been an amendment to the caveat, admitting a prima facie case. Objections to his testimony were urged to the effect that having admitted a prima facie case — that the will was properly executed, and that the testatrix was at the time apparently of sound mind — while it was proper to show lack of mental capacity at other times, evidence of mental incapacity "at the time the will was executed" was improper, as it was contrary to the admission made in the caveat that the testatrix "was at the time . . apparently of sound mind." The admission of this testimony was not erroneous. The amendment to the caveat admitting a prima facie case, though not here quoted in full, was complete and contained all elements necessary for that purpose, which in turn placed the burden of proof upon the caveator. Wood v. Davis,161 Ga. 690 (4) (131 S.E. 885); Tilley v. King, 190 Ga. 421
(3) (9 S.E.2d 670). With the burden of establishing lack of testamentary capacity, the caveator was not precluded from doing so by any competent evidence. Indeed, the very essence of such proof was the condition of her mind at the time of the execution of the will.
(a) Nor was the testimony of this witness incompetent under the Code, §§ 9-601, 38-418, or 38-1605. These sections have no application to the competency of an attorney as a witness with respect to essential facts attending the execution of a will.O'Brien *Page 782 
v. Spalding, 102 Ga. 490 (31 S.E. 100, 66 Am. St. R. 202);Waters v. Wells, 155 Ga. 439 (5) (117 S.E. 322).
9. Ground eleven alleges error in the admission of testimony, over an objection that the evidence was irrelevant. The testimony was in no way injurious. Moreover, it was not such an objection to evidence as presents any question to this court. Hogan v.Hogan, 196 Ga. 822 (28 S.E.2d 74), and cit.
10. Under ground twelve, of the motion for new trial, it is contended that the court in effect expressed an opinion that the testatrix did not have testamentary capacity, by giving the following instruction: "Further, gentlemen, as I have told you a moment ago, ordinarily the burden in this case would be upon the propounder, but the law provides that, where objections are filed, the caveator may admit what in law is termed a prima facie case, that is, admit the execution of the will with all of the legal formalities and admit an apparent mental capacity to make the will. The caveatrix in this case did not admit entire mental capacity but only apparent mental capacity, and when that is done, as has been done in this case, then instead of the burden being upon the propounder of the will, as the law originally placed it to begin with, to establish the factum of the will, it then shifts to the caveatrix — in this case — and the burden then is upon her to show by the preponderance of the evidence, and establish the contentions of her objections as set forth in this caveat, which as I have just told you is the fact that the deceased did not have sufficient mental capacity to make and execute the paper that the propounder says is the last will and testament of the deceased."
It is insisted that the last phrase in the preceding paragraph was an expression of opinion that the testatrix did not have capacity to make a will. No such construction can be placed thereon. It was an explanation of the issues, and under no circumstances could have been construed by the jury as an expression of opinion by the court.
Judgment affirmed. All the Justices concur.