1. "Where the question under examination, and to be decided by the jury, shall be one of opinion, any witness may swear to his opinion or belief, giving his reasons therefor." Code, § 38-1708. "Sanity or insanity is a proper subject for opinion evidence." Strickland v. State, 137 Ga. 115 (4), 117 (72 S.E. 922).
2. The issue on trial being the mental capacity of the testatrix to make a will, and a daughter of the testatrix having testified, as a nonexpert witness for the caveators, that she was living in the home of the testatrix at the time the will was executed, and had done so for several months before that time, being with her, seeing her, talking with her, washing and ironing and cooking for her, and the attorney for the caveators having then propounded to the witness the question whether in her opinion, based on these facts, the testatrix "at any of those times . . had sufficient mental capacity to make up her mind, to have a decided plan or wish or program as to anything," and the witness having answered, "I don't think she did, no, sir, in fact I know she didn't" — Held, that the court did not err in allowing such question and answer over the objection, "They haven't laid the ground for any such question by any of the witnesses, he is asking for an opinion by this witness as to this person's mind without laying any sufficient foundation to show that this witness knows her mental condition."
(a) Under the preceding ruling, there was no merit in the first special ground of the propounders' motion for a new trial. Grounds 2 and 3, being similar, were likewise without merit. Potts v. House, 6 Ga. 324 (4) (50 Am. D. 329); Frizzell v. Reed, 77 Ga. 724 (5); Strickland v. State, supra; Pennington v. Perry, 156 Ga. 103 (9) (118 S.E. 710); Merritt v. Wallace, 173 Ga. 435
(160 S.E. 610); Smith v. Tindol, 179 Ga. 801 (2) (177 S.E. 588).
(b) The question dealt with in Scott v. Gibson, 194 Ga. 503
(22 S.E.2d 51), cited for the plaintiffs in error, was the sufficiency of the evidence *Page 609 
to support the verdict, and not the admissibility of testimony. See further in this connection, Welch v. Stipe, 95 Ga. 762 (22 S.E. 670); Herndon v. State, 111 Ga. 178
(2), 180 (36 S.E. 634); also case note on form of question, 155 A.L.R. 281.
3. While ordinarily the sufficiency of the reasons given by witnesses for their opinions as to a person's sanity or insanity can not be determined as a matter of law by the court, but is a question for the jury (Gray v. Obear, 59 Ga. 675 (3); Frizzell v. Reed, supra; Hubbard v. Rutherford, 148 Ga. 238, 96 S.E. 327; Pennington v. Perry, supra), yet, where it plainly and indisputably appears that the reasons are insufficient, the court may on review so hold as a matter of law, and a verdict founded upon such evidence should be set aside as being unauthorized. Brumbelow v. Hopkins, 197 Ga. 247 (2) (29 S.E.2d 42); Wood v. Lane, 102 Ga. 199 (29 S.E. 180); Credille v. Credille, 131 Ga. 40 (2) (61 S.E. 1042).
(a) The question to be decided by the jury being one of opinion, and the opinions of various witnesses having been given, the verdict in favor of the caveators does not appear to have been based on any question as to veracity. Code, § 38-1708.
4. The amount of intellect necessary to constitute testamentary capacity is that which is necessary to enable a party to have a decided and rational desire as to the disposition of his or her property to take effect at death. Code, § 113-202.
5. There was no testimony of any expert witness showing or tending to show mental incapacity of the testatrix, and the testimony of every nonexpert witness to that effect was based on acts, conduct, and sayings of hers which did not within themselves show mental incapacity to make a will, and such testimony was therefore insufficient to support the verdict finding for the caveators. While several of the witnesses testified in effect that the testatrix had no greater mental capacity than a five or six-year-old child, the reasons given by each and all of the witnesses for these opinions, considered with the facts to which they testified, not only failed to support the conclusions stated, but tended to show the contrary. The verdict being without evidence to support it, the refusal of a new trial was error. See, in this connection, Peavey v. Crawford, 182 Ga. 782
(187 S.E. 13, 107 A.L.R. 828); Griffin v. Barrett, 183 Ga. 152
(187 S.E. 828); Hill v. Deal, 185 Ga. 42
(193 S.E. 858); Peavey v. Crawford, 192 Ga. 371 (15 S.E.2d 418); Scott v. Gibson, supra; Orr v. Blalock, 195 Ga. 863 (25 S.E.2d 668); Thomas v. Lockwood, 198 Ga. 437 (31 S.E.2d 791).
(a) The case differs on its facts from Morgan v. Bell, 189 Ga. 432 (5 S.E.2d 897), and Manley v. Combs, 197 Ga. 768 (30 S.E.2d 485), as to sufficiency of the evidence to support the verdict.
Judgment reversed. Jenkins, P. J., Atkinson and Wyatt, JJ., concur. Bell, C. J., and Duckworth, J., dissent from the rulings in paragraph 5, and from the judgment of reversal; concurring otherwise.
 No. 15165. JULY 9, 1945.
Mrs. S. Cordelia Lassiter died June 16, 1944. On September 23, 1943, she executed a will whereby she left all her real property, consisting of nine acres of land in Cobb County, being practically her entire estate, to three of her daughters, Mrs. Gladys R. Espy, Mrs. Leila L. Hamrick, and Mrs. Estelle L. Vickers, they to pay all of her just debts; and to her other children, seven in number, she left one dollar each. The above-named persons filed their petition to the court of ordinary for probate of the will in solemn form, praying that some one be appointed as administrator "in terms of the law," the testatrix having designated in her will no one to be executor.
The other heirs at law of the testatrix were: Mrs. J. A. Preston, Mrs. Fred Kalb, Hoyt C. Lassiter, Mrs. L. N. Murdock, Mrs. W. I. Lazenby, Mrs. T. W. Hagood, and L. N. Lassiter. Two of these last-named heirs, to wit, L. N. Lassiter and Hoyt C. Lassiter, filed a caveat upon the following grounds: That Mrs. Lassiter, at the time of making said pretended will, was not of sound and disposing mind and memory; and that at the time she executed the same she was more than eighty-nine years of age, and for several years prior to that date had been laboring under a disability known to the law as senile dementia.
The ordinary adjudged that Mrs. Lassiter was not capable of making a will at the time of executing it, and denied probate. The case was appealed by the propounders to the superior court. Upon the hearing in that court, the jury found in favor of the caveators. The propounders' motion for a new trial, based on the general grounds and three special grounds added by amendment, was overruled, and they excepted.
Special grounds of motion for new trial; rulings on evidence: The first special ground complained that — after Mrs. Preston, one of the daughters of the testatrix, had testified, among other things, that she and her husband lived with her mother from May 6, 1943, until December 7, 1943, only the three of them there, she (the witness) doing all the cooking, washing and ironing, and serving her mother in every way possible, and had further testified without objection; "Sometimes my mother was childish and sometimes she was like a grown person. Some times I didn't think she knew what she was saying, her mind was so bad. I would say she was like a child five years old. That was true a part of the *Page 611 
time, and a part of the time I could say she might have been better, sometimes worse than others. I don't think at any of the times I saw her between May of 1943, and December 7th of 1943, that she would know the contents of this will that is presented here, I don't think she would have known the contents even if it were read over to her" — the trial judge, over the objection of the propounders, permitted the witness to testify, in answer to the following questions propounded by the attorney for the caveators: Q. "I will ask you to state whether in your opinion your mother at any of those times had sufficient mental capacity to make up her mind and to know and understand a wish, a plan, or design of any kind? As best you can, I will ask you, from living in the home from May of 1943 until December 7, 1943, being with her, seeing her, and talking with her, and washing and ironing and cooking for her, state whether in your opinion she had sufficient mental capacity to make up her mind, to have a decided plan or wish or program as to anything?" — "I don't think she did, no sir, in fact I know she didn't." Counsel for the propounders had objected to both questions "on the ground that they haven't laid the ground for any such question by any of the witnesses; he is asking for an opinion by this witness as to the person's mind without laying any sufficient foundation to show that this witness knows her mental condition."
The second special ground of the motion complained because the judge allowed counsel for the caveators, over the objection of the movants' counsel, to ask the witness, Hoyt C. Lassiter, one of the caveators, this question: "From your experience and conduct in detail, state to the jury whether or not in your opinion your mother had mind enough or mental capacity enough at any time for months prior to September 23, 1943 [when the will was executed], and for months after September 23, 1943, or at any time embodying these times, to know and understand the contents of this instrument (indicating the will)?" to which the witness answered: "No, sir, I don't think she did." The ground of objection was: "We object to that question and the answer, and ask you to rule it out on the ground that he hasn't laid the foundation for this witness; he hasn't stated anything as I recall."
Before the question was propounded, the witness had testified that he had often seen and visited his mother, visiting her every few days while his sister and her husband were living with his mother, *Page 612 
from May, 1943, until December, 1943, sometimes remaining all day, at other times only a few hours; that he always had conversations with his mother; that she objected to administration on her husband's estate and wanted to run it herself; and that the witness had also given the following testimony without objection, before the question was asked: "At that time all the folks just after his death had signed a paper for my brother and myself to be administrators on my father's estate. And during the time she was staying down there they changed their mind and decided they didn't want no administrator, and I believe my brother had already signed up, and I hadn't been up and signed up, and as soon as she found out I had got to be administrator she raised sand to me, wanted to run the thing herself, and didn't want no administrator. And after qualifying she raised so much sand she was preparing to go to Florida, and she said it was going to knock her out of the trip, she was going to have to stay up here on account of the twelve-months-support proposition, was going to break her up, and she raised so much sand about it I didn't know what to do, I just wanted to do the right thing and give them all a square deal. And she made the statement several times down there after going home that it wasn't ours, that we didn't have anything to do with it, and I couldn't reason with her at all. She said that she knew the law and knew it was hers, and that the balance of us didn't have anything to do with it at all. She was claiming certain property that was the property of my father's estate, and she was arguing and insisting that it belonged to her, and we didn't think it did at all. I couldn't make her understand or comprehend that it wasn't hers, but that it was a different estate. That is a different estate from what is mentioned in this will. Her estate consisted of nine acres of land, and she was insisting that all of the land belonged to her. She had ten acres of land there originally, but one acre was sold off to my oldest sister. And so her estate consisted of nine acres. But she wanted the whole thing."
The third and last special ground complained that the court erred in overruling the propounders' objection to the following question, and in permitting the witness, Mrs. T. W. Hagood, a daughter of the testatrix, to answer the same. The question was: "From what you have testified, I will ask you to state, was your *Page 613 
mother's mental capacity in the last year or two of her life the same as it was when she was 30 or 40 or 60 years of age?" The answer was: "Until the last four or five years it has been, and for the past two years certainly her mind was not at all what it had always been; it was clear that it wasn't, and her mind was not good at any time that I recall." At the time the question was asked, counsel for the propounders objected: "That is not the proper way to ask it, whether it is as good as it was. That would be immaterial and irrelevant."
Evidence for the propounders: The attorney who drew the will, Fred Morris Sr. and two other attorneys, John T. Dorsey and John P. Cheney, were the attesting witnesses. All of these witnesses testified that the will was read to the testatrix in their presence; that she stated that she understood it, and it was the way she wanted her property to go; also that she was apparently of sound mind at that time. Mr. Morris further testified that, when the testatrix came to his office, she was accompanied by two of the three daughters who are the propounders; that when he was informed by the testatrix that she wanted him to write her will, he asked her if these daughters were to share in the disposition of her estate, and on being informed that they were, he asked them to retire from his office while he discussed the matter with the testatrix, and they did so retire; that she explained to him the disposition which she wished to make of her property, and he drew the will accordingly; that, when he had finished it, he read it over to her, and she stated that the will was not like she wanted it, that she had always heard that, if you do not mention all of the children in a will and give them something, "the will wasn't any good;" and that he then redrafted the will in part so as to expressly mention the seven children, and so that it would bequeath to them one dollar each; that he then read that part of the will the second time to the testatrix, when she said, "that is exactly like I want it." He further testified that he read the will to the testatrix again, in the presence of all the attesting witnesses, before it was signed by the testatrix and the witnesses.
He also testified that he had known Mrs. Lassiter for about ten years; that he had previously transacted business for both Mr. and Mrs. Lassiter; that he had drawn a previous will for her; and that on this occasion she stated she wanted to destroy or do away with *Page 614 
her previous will. He also testified that he had not noticed any change in her mental or physical condition during the last ten years; that he thought she had a very strong conviction about what she wanted to do with anything pertaining to her; and that at the time she executed the will in question she appeared absolutely to have a sound mind and memory.
Mr. Dorsey testified that he had known the testatrix for two or three years; that he and Mr. Morris shared the same offices; that he had seen the testatrix in the office of Mr. Morris five or six times; and that she always appeared to be rational and a person of sound mind.
The three daughters who were the propounders testified unqualifiedly that their mother, the testatrix, was of sound mind, as did several other witnesses for the propounders.
Letters written by the testatrix to her daughters, some shortly before and others after the will was executed, were introduced in evidence without objection. Two of these letters, one written before and one after the date of the will, being typical of the others, were as follows:
"Tuesday A. M.
"Dear Gladys and Leila
"Rec your letter today and also one from Estelle and as I dident get any letter from Either one of you last wk I begun to think I dident have a friend in the whol world but I never was as glad as I was when I got your letters this A M Well now I just cant write so much at one time The reason I wanted you all to send me the money so you could get the lots next to yours So send it on and youll get deeds They said it would be all right to make the deeds So now just send the money on and youl get the deeds before long Well now Flora has just come in and read your letters and took all of them and wouldent let me have them and she said she was going to write you all and tell you what A devil I was Well it is 3 P M and Im still on the land with the living Flora came and ordered me to let her read the letter I was writing to you but she picked up the letters that you wrote to me and wouldent let me have them So shes writing now They have been talking and planing among themself but shes the head leader I tell you what when she read your letters she cut a shine sure enough. She said she was going to call Leamon I told her *Page 615 
never mind for Leamon already had a letter now I have never said one word only one time and that was the truth If you want the lots just send the money at once and youl get the deeds without any dought about it. I think I can have a little rest I just hope I can for I never went through with such a time in all my life Ill tell you later on if I live long enough Trust you are all well. I stay up most of the time Your Mother."
(This letter was contained in an envelope bearing the postmark, Marietta, Ga. June 23, 1943. It was addressed to Mrs. R. R. Espy, Jacksonville, Fla.)
"Tues a. m.
"How are you all getting on If you and Roy can comeup in your car after me I think it would be better to come to your house first and then come back by Mauds when I come back if God spears my life that long I dont know when Flora and John are going to get out. Il let you know when I find out Maud was up She said she would come up on the bus and cary me down to her house but I dont want to go that way Leila said she thought that you and Roy could come So Il let you know when they get out the weather is fine trust alls well I am able to be up. let me hear from you soon With love Leila hold to what you got till I see you With love your Mother."
(The envelope bore the postmark Marietta, Ga. Sep. 28, 1943. It was addressed to Mrs. R. S. Espy, Jacksonville, Fla.)
Evidence for the caveators: Mrs. J. A. Preston testified in part: Direct examination — "My parents were Mr. and Mrs. H. C. Lassiter. . . At the time my father died in 1942, I was living at 1586 Stewart Avenue, in Atlanta. Then on the 6th day of May, 1943, I moved here with mother. . . I lived with her there then from the 6th of May until the 7th of December, 1943. . . In the period of time from May of 1943, her mind got weaker, considerably. Some times my mother was childish and some times she was like a grown person. Some times I didn't think she knew what she was saying, her mind was so bad. I would say she was like a child five years old. That was true a part of the time, and a part of the time I could say she might have been better, some times worse than others. I don't think at any time I saw her between May, 1943, and December 7th, 1943, that she would have known the contents of this will that is presented here. I don't *Page 616 
think she would have known the contents of it even if it were read over to her. I will say that, from living in the home there from May of 1943 until December 7th of 1943, and being with my mother and seeing her and talking with her and washing for her and cooking and ironing for her, in my opinion she did not have sufficient mental capacity to make up her mind, or to have decided plan or wish or program as to anything, in fact I know she didn't. And with regard to talking to her at any time between those dates, my mother could not carry on and did not carry on an enlightened lengthy conversation of any character. My mother was 89 years old on the 13th day of last February. . . There was nothing wrong mentally with my mother in the earlier years of her life. In her latter years she wasn't nothing like she used to be; she wasn't herself at all. I think that one thing that brought about this condition in my mother was the fact that one of my sisters lost her mind, and I think my mother worried a great deal over her, and then father being in the condition he was in was another thing; and then I imagine of course that her getting older had something to do with it. I don't think my mother at any time from May, 1943, to December, 1943, had mind enough, without suggestions and directions from others, to make up her mind and have decided opinions or wishes. With reference to the conversations I had with her during all that period of time, and whether they were clear or vague — well, she was always talking about we were going to sell her out of house and home, and I would say, `Why, mother, we hadn't thought of such a thing,' and I would get through with my work and go in and sit down and I would talk to her and she would bring this up, and I would say, `Mother, let's not talk about that, let's talk about something else,' and I couldn't get her to talk about anything else; that's all she talked about the whole time."
From the testimony of this and other witnesses, it appears that the "house and home" was on a tract of land, title to which was in the estate of the testatrix's husband, who had died intestate; this tract containing about 30 acres and lying adjacent to the 9-acre tract owned by the testatrix and described in her will.
Continuing, the witness testified: "Something was bearing on her mind about this land, and about her having full control, and that they didn't have anything to do with it, that it didn't belong *Page 617 
to us, and that is all I could get her to talk about. As to whether she did that once a day or whether it was something constantly going on — well, some days she was quiet and would rest a lot. . . Then, when any one came there on business or to visit, . . if they had time to talk to her, she would have all this arguing to go on about the land, and that we were going to sell her out of a house and home. She did that with total strangers, anybody and everybody. . . I remember one special time there when I had company, that was Mrs. Megarrity and Mrs. Williams, and mother came up where we were in the dining room, she was sitting on the other side of the table and we were on this side, and mother came up there and came around and accused me and Mrs. Megarrity of making fun of her, and then she told Mrs. Williams she was going to hell because she had her lips painted. . . She just broke in that way. She was hard of hearing, but we talked loud enough that she could have heard us; but she couldn't hear everything and she would get up and come around where we were. She did state there that me and Mrs. Megarrity were making fun of her, and we hadn't mentioned her, hadn't thought of such a thing. . . I note the document you present to me there with the signature of Mrs. S. Cordelia Lassiter on it, and I will say that in my opinion my mother was too childish to understand and comprehend the meaning and effect of that paper; she was not competent. From May to December of 1943 I think my mother's mind was unbalanced."
Cross-examination — "I said I thought mother some times had the mind of a five-year-old child, and I think some times not that much . . Mr. Welsch was asking me about the period of time there along between 1942 and 1943. As to whether or not during all that time she had the mind of a five-year-old child — well some times a child has got a better mind than it has at other times. I certainly said her mind was unbalanced. I say that because it wasn't mother at all; she wasn't no more like she was before she lost her mind than nothing, because she didn't act like she did when her mind was good. I say that from the way she acted. She had it in for all of us, for me and for all the rest of us. . . She read the Bible and she was a pretty-well-read old lady. She was a little too well versed in the Bible for her good. She knew too much about the Bible, that is, it preyed on her mind, I think. *Page 618 
That is what caused a lot of trouble, she read the Bible too much and it weighed on her mind; I think she read too much. She read it from morning until night and some times until ten o'clock at night. I think some times people can pore over the Bible too much. I read the Bible some times, but I never have thought about it and don't want to read it as much as she did. I didn't say I thought she was a person of weak mind because she read the Bible; that wasn't what I meant at all. What I said was after her mind got bad she read the Bible too much and it made her worse. One thing she did that showed her mind was bad was the way she talked, and the way she went on about us wanted to sell her out of a house and home after father died, and she didn't want the boys to have anything to do with it at all, didn't want them to handle a thing, she was going to have full control and we wouldn't have a thing to do with it, that we didn't have a dollar in it, and that we were going to sell her out of a house and home when we hadn't thought of such a thing. . . I certainly do say that she was of unsound mind when I lived with her. I didn't say that because her mind was bad. She just lost her mind, to a certain extent. You know when a person loses their mind from the way they act. . . I know the life that she lived before she lost her mind, and I lived with her after she lost it. Her mind hasn't been good for four or five years; I don't know exactly how long, because I wasn't in the home. Her mind was not good in 1942. I know it was bad, but I wasn't in the home; I want to explain that, I wasn't with her very much until 1943 when I went in the home, and I found out then beyond the shadow of a doubt that she was not right."
Mrs. M. E. Megarrity testified in part: Direct examination — "I live on the Roswell Road, just across the four-lane highway. . . I have lived there since 1935 . . Since 1935 is the only time I have known Mrs. Cordelia Lassiter. I am acquainted with Mrs. Preston over there, in fact I have known her ever since I have known Mrs. Lassiter. I have visited Mrs. Preston in the home there before the death of Mrs. Cordelia Lassiter. For the last few months before September 23d 1943, I visited in the home there, and Mrs. Lassiter was there in the home at that time. . . With reference to any things I saw and heard there from Mrs. *Page 619 
Lassiter while I was visiting there that would throw light on the question of whether or not she was of sound mind, I will say that I was visiting with Mrs. Preston one afternoon and we were talking about just first one thing and another, and Mr. Megarrity in the meantime had been appointed to go down to Wesley Memorial Church in Atlanta . . and so the next day I went over to visit with Mrs. Preston, and we did as usual. . . So I was telling Flora [Mrs. Preston] about the annual conference and different things that had happened down there that day, and I said the preachers were going to be given a dinner at a certain hotel . . and Mrs. Lassiter says, `What did you say?' and she came and got between Mrs. Preston and me, and Flora says, `Mother, we were only talking about the conference that Mr. Megarrity was attending, and Mrs. Megarrity was telling me that they wear going to entertain the preachers at a dinner at a certain hotel;' and she says, `Oh, well, that's the trouble, that's the trouble, all these preachers, every one of them is going to hell.' . . Mrs. Lassiter looked at Gladys Williams, and she says, `Do you believe in the Bible;' and Gladys says, `Yes, I do.' And then she says, `Well, if you believe in the Bible, you wouldn't have that lipstick on your lips and rouge on your face, and if you are going to wear that lipstick and rouge, you are going to hell, that's all.' And she looked at me and says, `You are going too.' I did not have on any lipstick at the time, and I says, `What am I going for?' and she says, `You are going for lying.' I had not lied that I knew of. I says, `What have I lied about?' and she says, `Well, you told me you were coming up here to look after me and you haven't come, this is the first time I have seen you since;' and so I said, `Mrs. Lassiter, I didn't know I said that.' As to whether or not you could carry on an intelligent conversation with her — well, those are the only things she would talk about, just moving-picture shows and dancing and lipstick and rouge and things like that, she was against them, and she thought everybody else ought to be. . . Whenever she attempted to talk, her conversation was disconnected, and she wouldn't talk about what we were talking about. From being around her and while there in the home visiting, to my way of thinking and in my opinion I would not think that she had mind enough to carry on an intelligent conversation. In my opinion Mrs. Cordelia Lassiter did not have mind enough and sufficient mental capacity, at any time back in *Page 620 
the summer or fall of 1943, to make up her mind and to have a decided opinion or desire or plan for anything. . . I will say that during the summer and fall of 1943 I do not think Mrs. Cordelia Lassiter would have known the contents of this paper and have understood the effects of it. And supposing that it had been read over to her once or twice, I do not think she would have been able to know its contents and have understood its effect. The conversation of Mrs. Lassiter and her acts sounded insane to me, that of a child, I would say."
Cross-examination — "I say that Mrs. Lassiter's mind was unsound for the reason that I don't believe that any person with a good, sound mind would say all the preachers were going to hell. I sure think they might save a few of them, I sure do. . . I have never heard a preacher say that all the folks were going to hell. And now, because she said all the preachers were going to hell, I think her mind was unsound. As to whether or not that is what I base it on — well, I think it was unsound. . . I said I thought she was childish. I say that because she talked childish. . . I don't remember now if I saw her the week before she made this will, nor that I saw her on the day that she made it; I might have, but I don't remember it. I don't know what the condition of her mind was when she was over there in Mr. Fred Morris's office. As to whether or not, if she was over there and this was read over to her and she told them she understood it, I would know whether she understood it or not — well, I would say that I don't think so. I surely don't know if she told Mr. Fred Morris what to put in this will. If she told him what to put in it, I still don't think she knew what it meant."
E. G. Megarrity testified in part: Direct examination — "I had occasion frequently to see and be around Mrs. Lassiter during the last year or so of her lifetime. As to whether I was in Mrs. Lassiter's home prior to September 23, 1943 — well, no, I hadn't been in the house for some little time. I can't now recall the last time I was there prior to that time. I was up there probably early in 1943, but I don't remember the date. I was up there before the death of Mr. H. C. Lassiter. I went up there in 1942, in the early part of the fall . . and she says, `I told you you couldn't talk to him,' and slammed the door again, and I turned and left, and I didn't go back any more until he died. I had known her *Page 621 
for fifty years prior to that time; I had known her back in the eighties. We grew up together as boys and girls. Our relationship was friendly. . . I never had anybody friendlier than her and brother Lassiter. . . I don't think Mrs. Lassiter knew and understood what she was doing with reference to me at the times I have mentioned here; because she had never treated me that way; she had took me into their home you might say hundreds of times during all those years, and was as nice as could be to me on all other occasions."
Cross-examination — "It wasn't because they wouldn't let me come in there to talk to a sick man at death's door that I now say she was of unsound mind; I said she had always invited me in before, different nights, and treated me as nice, until ten and eleven o'clock at night, as nice as anybody in the world. He wasn't at the point of death; it was some several days, but I won't say how many."
Carl Ballew testified in part as follows: Direct examination — "I was acquainted with Mr. H. C. and Mrs. Cordelia Lassiter in the last few years of their lifetime, I will say practically two years before he died. During that particular two years I lived just back this side of the H. C. Lassiter home place on the Roswell road. . . I lived there in that place for two years, and the property belonged to Mr. H. C. Lassiter. . . During the lifetime of Mr. H. C. Lassiter I paid the rent to him, while he was at home, and I was still living in that same house at the time Mr. Lassiter died. . . I have been over to the home place of Mrs. Cordelia Lassiter on one or more occasions and seen her and talked with her, after Mr. H. C. Lassiter died. I went over there to pay the rent, and just occasionally she wanted little jobs done such as cleaning the yard around there and helping her for a few minutes when I would have the spare time to be at home. . . I will say that I had this experience on one occasion when I came up in contact with Mrs. Lassiter: I went to pay the rent about a month before this contract was signed, as I understood. . . I had some money in my pocket to pay the rent, and she said, `No, you can't pay me none;' she says, `What are you paying rent for? you can't pay me no rent, and the thing for you to do is to get away from here, get out of my house, I don't want anything to do with you.' I had for months been paying rent on that house to her. And I just *Page 622 
decided quick that she was a young-minded person, more like a child, and so I thinks later I will go back, and if it is like all the other occasions it will be all right. So I came back to the house, and it wasn't more than an hour until she came wanting to know if I didn't think it was time for me to pay rent. And that is the way she did. So an hour after that experience I had with her I paid her the rent. Then on other occasions she would tell me things, and turn around in a few minutes, little things that didn't amount to anything, little subjects, and then she would turn back and tell me the same things over again; and you know that any one with sound mind and judgment that was a small, young, tender mind, more like a four or five-year-old child, if it be that old. Then my wife did some work for her occasionally, and she happened to go out there one morning when I was with her, for some little old purpose, I don't just exactly recall what for, it might have been to help Mr. Preston do something, I don't recall what now; and my wife knocked on the door and Mrs. Lassiter came to the door, and she says, `What do you want?' and she says, `I came out here to do a little washing, or whatever it might have been.' `Why,' she says, `I never sent for you, what are you coming out here before I send for you,' or something like that. Well, naturally I couldn't believe that she had the mental capacity or mind to do business. Then we had a little old hickory tree there in the yard, and it had been topped, it was low and spread out, and there was limbs falling there, and I was going to cut them because my little children was walking around there and I didn't want them to get hurt or get hurt myself, and I asked questions around, and Mr. Lassiter, her son, told me to cut it, and as I recall I went to cut it and she came out there, and you couldn't get any business out of her at all. Of course we hadn't had any fuss, and I wasn't mad at her, and there was a big limb there I wanted to cut, and I would ask her to get back from under the tree; I says, `If something falls on you, then you will be hurt, get down here under another tree;' and all of a sudden there was a chunk fell off of the tree and fell down by the side of her, and she didn't even feel that, but it scared me and I jumped back then. So from those occasions that I have detailed, and from having been there before Mr. Lassiter's death and after his death and up until April of this year, I will say that in my opinion for months before *Page 623 
and after September 23, 1943, Mrs. Cordelia Lassiter did not have mind enough or mental capacity enough to make up her mind and to have a decided opinion and to know what she wanted to do or to have a decided and definite wish or desire or plan about anything; I don't believe she did at any time, and the fact of the business is, I know she didn't. . . And in my opinion she did not have mind enough at any of those times to have known the meaning and effect of the disposition of the property after her death. When I say childish, I am speaking of a child of four or five years, rather small. And from my talking to her and her talking to me during those incidents I have detailed, I would say that in my opinion she did not have sound and disposing mind."
Cross-examination — "I did not read the paper which Mr. Welsch exhibited to me; I have never read it. . . As to whether I am still telling this jury that that old lady didn't know enough to understand what was in that paper when I didn't know what was in it myself — I could read it and know what was in it. But I don't know what was in it myself. But a five-year-old wouldn't understand that, even though it just said the cow crossed the road. I don't think she would have understood that. . . I say now, if this paper had been read over to her she would not have understood it, and I don't believe she would. I did not see her the day she came up here and signed this paper, and I don't recall if I was here on that exact date. And I have told you the truth; I don't think it was any better then than it was when I was talking to her previous to that back there. I know it wasn't any good while she was over there. Her mind didn't seem to get any better than when I did have contact with her. I base that on what I have stated to the jury, and other simple little things."
Hoyt C. Lassiter, a son of the testatrix, testified in part as follows: Direct examination — "During the last year or two before my mother's death I had quite a number of occasions for seeing my mother and being around her; . . That was in the last two or three years and the last several months before her death. And shortly after his death [witness's father], she came down and stayed with my oldest sister on Stewart Avenue . . out of Atlanta, and I lived near by and carried the mail on that route out of Atlanta. I lived within about a mile or a mile and a half from them, and I *Page 624 
would go over there and see them. . . She was claiming certain property that was the property of my father's estate, and she was arguing and insisting that it belonged to her, and we didn't think it did at all. I couldn't make her understand or comprehend that it wasn't hers, but that it was a different estate. That is a different estate from what is mentioned in this will. Her estate consisted of nine acres of land, and she was insisting that all of the land belonged to her. She had ten acres of land there originally, but one acre was sold off to my oldest sister. And so her estate consisted of nine acres. But she wanted the whole thing. . . Then from May, 1943, I did have occasion to visit with and see my mother quite often at her home out here from Marietta. . . It is my recollection that I went up there once every week, or two or three weeks until December of that year. . . On those trips up there, some time I would go and stay all day, but most of the time I would maybe go in the afternoon, something like that, stay two or three hours, some times maybe an hour or two. . . I never did see Mrs. Preston mistreat my mother. On none of those trips did I see her mistreat her, I certainly did not. . . From my experience and my contact with her, as I have detailed to the jury, I will state that in my opinion for months prior to September 23, 1943, and for months after that date and at any time embodying those times, my mother did not have mind enough or mental capacity enough to know and understand the contents of this instrument. . . I do not believe, on account of her age and the condition of her mind, that she could form and make a good decision with regard to a will like that; she was incompetent, according to my way of thinking and my experience and understanding. She could not understand the effect of the disposition of the property after her death, not according to the way I understand a sound mind. She acted more like a child than she did an adult. . . In my opinion, on September 23, 1943, and for months before and after that, my mother had reached what we call second childhood, and her acts and conduct was like that of a child five or six years old, something like that. She could not carry on an intelligent conversation; it would be incoherent; it would not be a substantial conversation at all, jumping from first one thing to something else."
Cross-examination — "I think I saw my mother the same day *Page 625 
this will was signed, September 23, either that day or the next day; it might have been the next day after this, when I was up here at Marietta making some papers. . . I don't know what took place over in Mr. Fred Morris's office on the day of this business. As to whether I know then what the condition of her mind was on that day — well, according to what the condition of her mind just before and just after that, I can't see where there would be much difference, and that is the way I came to a conclusion. . . There have been times in the past when she knew as much about what she was doing as anybody; but she was getting old, she was past 89 years old, and I am telling you the truth, I am going by the way she would carry on, and her conversations . . That is not the only reason I think she was of unsound mind, but that is one of the reasons. . . One thing I can recall was that every time I would come up here she would jump on me, and there wasn't much satisfaction in coming, but naturally I knew it was my duty to come, but there wouldn't be any satisfaction in it. She would preach us a sermon about the way we were living and about the way other people were living, and she would say that we were going to hell, and I got tired of that and it was kinder boring, but I kept coming, I didn't stop coming, but it wasn't much pleasure. I wouldn't say that the old lady got to be a nuisance, I wouldn't call it that, but I would say anybody with a mind like that, would go on that way, wouldn't have a sound mind enough to make a good sound judgment on a will. . . I said that always when I came up here the question of this property seemed to be on her mind, all the time, and it looked like I couldn't reason with her, when all in God's world we wanted was to see that she was looked after. And naturally, after I saw the shape that her mind was in, I didn't want to turn the whole property there over in her name, place the title entirely in her name, because I thought she would give it all away; that was my reason personally for objecting to that . . . But it was her idea that she ought to have the whole 40 acres; and she had the idea that it belonged to her, that the balance of us didn't have anything to do with it, that we weren't entitled to it, that it was her place to run the whole thing; that is what she contended to me. As to whether or not I think her mind was unsound because she argued and contended that way — well, not on that alone, but that was one of the things; it takes several things to *Page 626 
make up your mind about that. As to whether or not I objected to her having a year's support — I objected to the petition they put in to place the title in her alone."
Jas. J. Daniel testified in part as follows: Direct examination — "I have resided in Cobb County for 67 years. I am ordinary of this county. During her lifetime I was acquainted with Mrs. Cordelia Lassiter, not intimately so many years ago, and more intimately recently. . . She came in there and talked to me quite a few times after the death of H. C. Lassiter, I don't know how many times. . . As to the question of mental capacity of Mrs. Lassiter on September 23, 1943, and my opinion that, based on my knowledge of her and independent of this will, whether she had mind enough or mental capacity enough to know and understand the contents of this will which you exhibit to me — I would say that she seemed to get somewhat worse; she couldn't reason. I tried to explain to her that she had a share in the H. C. Lassiter estate. She thought she owned it all. She didn't want anybody, the law or anybody else, to interfere with it, and she told me she was the law with reference to that estate. That was later on after she became excited about it, and it was impossible to reason with Mrs. Lassiter."
Mrs. T. W. Hagood, a daughter of the testatrix, testified in part as follows: Direct examination — "The last time I saw my mother while she was well was just a short time before she went to Florida the last time. . . I think that was some time during November of 1943. And my sister, Mrs. Murdock, and myself had planned to visit our afflicted sister up near Roswell . . and we stopped at our mother's old home to carry mother with us . . and when I went in mother was sitting in a chair mending some garment. She was just as quiet and all as she could be at that moment. My sister, Mrs. Preston, was in the kitchen doing some work, and when mother saw me she just went delirious wild and she began to go on something terrible and we tried to quiet her, and we wanted to take her to Roswell to see our sister, her daughter, and no, she couldn't go, she couldn't do it, and she carried on so that we couldn't do it, and we just left and went on without her. That was the last time I ever saw mother while she was alive and well."
Cross-examination — "I saw my mother there occasionally, but I *Page 627 
didn't see her every few weeks because it was inconvenient for me to be up here, and besides, her mind was so bad. I did visit her, and I even stopped to carry her to Roswell, and then I came back. As to whether I told Mrs. Espy and Mrs. Vickers when they were here and asked me to go and visit my mother that positively I would not go — I didn't feel at that time like going, because her mind was so bad and there was no reason about her at all. . . I said my mother's mind was certainly not as good as it used to be. I say that because when we used to visit mother in the home there she was just as agreeable as anyone ever could be, and you could talk with her in a conversation and she would be happy, and in the last year or two there was no reason about her, she just carried on all the time about how we were trying to throw her out of doors, one way and another, and we certainly didn't want to do that, and we couldn't get her mind off of those things; she wouldn't talk about any other topic than those. . . I said, the day we went by there mother was doing some mending there, and when we got there she got excited and just went all to pieces when she saw me and every time I would see her. I never had a bit of trouble with mother in my life. It wasn't only because of that one occasion that I said her mind was unbalanced, but it was every time we went up there, and the conversation she carried on that way, all the time. I said that her mind wasn't as good as it used to be."