## A01A0851. IN RE COPELAN.
(553 SE2d 278)

ELDRIDGE, Judge.

Evelyn Copelan appeals the jury verdict of the Superior Court of Putnam County finding her an incapacitated adult as to her person and property. For the reasons discussed below, we reverse.

The standard of review on appeal from the denial of a motion for directed verdict or for judgment notwithstanding the verdict is "any evidence." OCGA § 9-11-50 (a); *Crump v. McDonald*, 239 Ga. App. 647, 648 (520 SE2d 283) (1999). However, "any evidence" means any evidence "sufficient under the applicable standard"; here, the standard is clear and convincing evidence. OCGA § 29-5-11 (a); *Kodadek v. Lieberman*, 247 Ga. App. 606, 610 (2) (545 SE2d 25) (2000). As such, under a clear and convincing standard, there must be substantial evidence to constitute "any evidence" to support a verdict under such intermediate standard of proof; a scintilla or slight amount of evidence would not satisfy such a higher standard of proof.[1] OCGA § 29-5-11 (a); *Kodadek*, supra. As the "any evidence" standard means any evidence "sufficient under the applicable standard" in the court

---

[1] This Court must therefore view the evidence presented at trial and determine whether some evidence supported the jury's verdict, and, in doing so, must view the evidence in the light most favorable to the party for whom the verdict was rendered. *Kodadek*, supra. Where a jury returns a verdict and it has the approval of the trial judge, the verdict must be affirmed on appeal if there is "any evidence" to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. Id. This Court "must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of [the] motion for . . . new trial will not be disturbed." (Citations and punctuation omitted.) *MARTA v. Green Intl.*, 235 Ga. App. 419, 420 (1) (509 SE2d 674) (1998).

below, to determine whether to uphold the jury's finding in this case, the evidence supporting guardianship over Mrs. Copelan's person and property must, indeed, have been clear and convincing.

Viewed in this light, the evidence showed that Mrs. Copelan's husband, Russell Copelan, died on September 11, 1992. Mr. Copelan, by will, left his estate, including a substantial dairy farm, to his wife if she survived him. If she failed to survive him, his four children inherited under the will to be distributed equally among them.

Mrs. Copelan actively participated in the day-to-day activities of running the dairy farm prior to, as well as after, her husband's death. Most notable of these activities as adduced from the record included ongoing bookkeeping, check writing, and her voluntary completion of duly authorized survivor deeds.

After her husband's death, Mrs. Copelan's children assisted in some aspects of the dairy business. For example, her oldest son, Thomas, helped Mrs. Copelan manage the farm, while Willie David ("Danny"), the youngest, participated in the physical labor of the business. The other two children, Uyvonna and John, had independent employment and did not work on the farm in any ongoing substantive capacity. In approximately 1995, Uyvonna moved in with Mrs. Copelan.

Approximately two years after Mr. Copelan's death, the dairy farm business began to go into debt totaling approximately $170,000. Uyvonna testified that Mr. Copelan "always told [Mrs. Copelan], if the business got bad to sell the cows, not to sell the land." Mrs. Copelan proceeded to sell a herd of dairy cows to alleviate the debt.

This decision to sell the herd caused significant family conflict. Thomas believed that the dairy herd was his and that Mrs. Copelan would never dispose of this property unless something was wrong with her. John concurred in this opinion. The conflict reached such a peak that Christmas activities in 1996 were suspended and threatening words were exchanged among the children, most notably a vituperative phone message left by John on Danny's answering machine threatening Mrs. Copelan with "embarrassment" in the community and a lawyer who was "chomping at the bit" to take the case.

Consequently, on October 1, 1997, Thomas and John filed a petition for the appointment of a guardian both as to Mrs. Copelan's person and property alleging that she was an incapacitated adult. The specific incapacities designated by the petition were "mental disability" and "advanced age." As such, the petitioner alleged that Mrs. Copelan: (1) lacked sufficient understanding or capacity to make significant responsible decisions concerning her person or [was] incapable of communicating such decisions; and (2) [was] incapable of managing her estate, and the property of the proposed ward [would] be wasted or dissipated unless proper management [was] provided or

the property of the proposed ward [was] needed for her support or the support of persons entitled to be supported by the proposed ward.

On October 24, 1997, after reviewing the petition and the psychological evaluation report concerning Mrs. Copelan, the probate court found no probable cause to support a finding of incapacity. Significantly, the psychological evaluator of Mrs. Copelan, Jeff Duffey, found that Mrs. Copelan suffered symptoms of clinical depression, but was not incapacitated to such a degree that a guardian should be appointed over her person and property. However, as a result of the unfavorable probate court ruling, Thomas and John Copelan appealed to the superior court on November 24, 1997, and a jury trial ensued.

At trial, the jury heard relevant testimony from expert and lay witnesses concerning Mrs. Copelan's alleged incapacitation. Mrs. Copelan neither testified nor appeared at this trial. John testified that the apparent reason for her absence was "embarrassment," as she was a "sweet, genteel, epitome of a southern lady" and "never liked to discuss the family business in the community."

Dr. Anna Marie Paulsen, petitioner's expert in mental incapacity, testified at trial by deposition. Dr. Paulsen was the psychiatrist who evaluated and treated Mrs. Copelan on several different occasions. The first visit with Dr. Paulsen was March 4, 1996. Dr. Paulsen performed a "clinical interview" which entailed a basic review of systems and various counting tests. Significantly, Dr. Paulsen did not give Mrs. Copelan any "mental cognition tests" as she "came across very well in that first session." However, at this initial visit, Dr. Paulsen noted that Mrs. Copelan: "was very nervous, she felt anxious. She mentioned her husband's recent death. She was nervous about what to do with the business and she made reference to there being some dissension between her sons about the business." Dr. Paulsen's diagnosis of Mrs. Copelan's condition after the first visit was "major depression, single episode, severe." Significantly, there was no mention of mental illness or mental incapacity. Dr. Paulsen's reasons for this initial diagnosis were the following:

> She [had] trouble sleeping through the night. She said she cries very easily, she said she is not sure why. She said it did start when her husband passed. She felt like she couldn't stay by herself. She couldn't remember names. She reported a tremendous amount of anxiety. Then she appeared very depressed and anxious, even a bit slowed, mentally slow and dull. She was self-conscious of information she seemed to be giving to me. She knew her age and she knew the day of the week, but in terms of — and she knew general information. She knew the birthdays of all of her children. But she

seemed fuzzy in terms of trying to tell me some information. And she could not do counting by serial sevens down from 100, or threes.

As a result of the diagnosis, Dr. Paulsen prescribed an anti-depressant, Pamelor, to treat Mrs. Copelan's depression. On two subsequent visits, Mrs. Copelan's status seemingly improved. Dr. Paulsen noted Mrs. Copelan's statements: " 'I'm feeling much better, I'm not crying as much. . . . Mentally clearer. . . .' I noted she looked good, but seemed very sad." On Mrs. Copelan's December 11, 1996 visit, Dr. Paulsen stated that Mrs. Copelan was "clear, coherent and oriented," but Dr. Paulsen noted that she was still "depressed." As a result, Dr. Paulsen discontinued the Pamelor prescription, but prescribed Serzone to further treat Mrs. Copelan's seemingly chronic depression. On the December 18, 1996 visit, Dr. Paulsen testified that Mrs. Copelan stated: " 'I feel the best I've ever felt, wow, a big difference. I feel motivated. I'm not too dizzy, I'm sleeping better and I have no side effects.' " As a result, Dr. Paulsen concluded that "she was alert, she was oriented, she was non-psychotic."

On the next visit, Dr. Paulsen made no note of confusion or disorientation, but changed Mrs. Copelan's medication to Effexor because the Serzone had not alleviated Mrs. Copelan's depression. At the next visit, Dr. Paulsen noted in her records that Mrs. Copelan "[took] care of herself, sleeping, eating, clothing." Finally, on October 8, 1997, Dr. Paulsen diagnosed Mrs. Copelan as: "awake and alert, but very distant . . . she had serious depression. I recommended that she go into a hospital to get help." Despite her depression, Mrs. Copelan indicated to Dr. Paulsen that she was capable of managing her own affairs, telling her, "[I am] all right — I write my checks on my own."

Significantly, on cross-examination, Dr. Paulsen was asked if she could state to any degree of medical certainty that Mrs. Copelan "didn't know where she was, didn't know what she was doing and couldn't handle her affairs." In response, Dr. Paulsen retorted that the date of her last record would "not indicate" such. The most Dr. Paulsen could conclude was that Mrs. Copelan was "sad." In Dr. Paulsen's opinion, Mrs. Copelan needed to be hospitalized because she: "had a history of coming into treatment and out of treatment with irregularity, not following through with medication for any length of time."

Testimony was also heard from an attorney, George Lawrence, who had been engaged by Mrs. Copelan to enact certain survivor deeds in 1997, but who also knew her personally for approximately 50 years prior. Lawrence testified that in 1997, Mrs. Copelan seemed to be in touch with reality and spoke articulately. Moreover, Mrs. Copelan returned and/or called a second and third time to Lawrence's

office to discuss and sign the deeds in his presence. When asked if Mrs. Copelan understood the legal implications of the survivor deeds, Lawrence testified that she comprehended the legality of the deeds or "[he] would not have drawn it otherwise." This discussion occurred after Mrs. Copelan had taken the deeds home to peruse them on her own. Moreover, Lawrence, in his opinion, perceived no evidence of duress or undue influence over Mrs. Copelan.

Contrary to Dr. Paulsen and Lawrence, Thomas Copelan testified as a lay witness that Mrs. Copelan's mind was slipping:

Q. Did you ever notice your mom after your dad died, . . . start to forget things or just act different than she did before?
A. Oh Yeah, Oh Yeah. I suppose a lot of it came with age and pressure and all. But she did. Her mind definitely was slipping, and she admitted to me a lot of times, you know, she'd say, I can't remember this, can't remember that, you'll have to help me remember this, have to help me do that.

Thomas testified further that Mrs. Copelan exhibited forgetfulness that got worse with age:

Q. Prior to your dad's death, had you ever noticed your mother having any problems with forgetfulness?
A. Well, . . . like I say, she was getting older, and it was — you could tell it was a progressive thing. I mean, the older she got the worse it got. And it started, you know, years ago. Of course, I guess I'm starting to forget a few things myself, you know.

However, Thomas also proffered evidence that, despite her apparent mental slippage and forgetfulness in his opinion, Mrs. Copelan: (1) maintained the books for the dairy farm, both prior to and after her husband's death; (2) executed survivor deeds; and (3) drafted checks necessary to operate the dairy business.

Further, Thomas testified that Mrs. Copelan's conduct, with respect to selling the cows, if not due to her alleged mental slippage, was otherwise promulgated by the undue influence of Uyvonna and Danny Copelan: "I started this litigation because she was giving away her property and not knowing what she was doing, or else under duress doing it. . . . Her life was being controlled by my sister [Uyvonna]. Being totally controlled, and she wasn't living no kind of life. . . . [S]he was being manipulated."

Similar to Thomas' testimony, John testified at trial concerning Mrs. Copelan's allegedly deteriorating mental condition:

> Well, at the time daddy died, . . . she wasn't able to deal with all of it because even then her mind was starting to slip, and she was nervous or she was taking anti-anxiety drugs all the time because she just couldn't deal with it. She cried a lot, she just said that everything was driving her crazy. . . . It got progressively worse. It got to the point that she was crying daily.

John further testified that Mrs. Copelan "told [him] that she really needed [his] help, that she just couldn't do things for herself, and told that [John] was the only person that had ever helped her in the right way."

John alleged that he and Thomas have had almost no contact with Mrs. Copelan as a result of the alleged undue influence of Uyvonna and Danny. "They [Uyvonna and Danny] had absolutely brainwashed her and had beaten that poor woman down until they have sucked every bit of life that she has out of her."

John's ex-wife, Ann Copelan, a professional artist and master's level psychologist, without objection, also testified as to Mrs. Copelan's mental capacity even though she was neither qualified nor tendered as an expert witness in the case.[2]

Specifically, Ann Copelan testified to an isolated occurrence at Phipps Plaza mall where she and Mrs. Copelan were shopping together. She testified that Mrs. Copelan's: "memory seemed to be failing at that time, because in going to some of the same places and everything, I would tell her to meet me at certain places, and she wouldn't be there. And I would have to look to find her." However, she never gave specific facts upon which the jury could weigh her lay opinion — i.e., appeared dazed, disoriented, did not know where she was as opposed to losing track of time shopping. For example, when asked whether there was anything in particular that led her to be concerned, Ann Copelan responded, "Just because she didn't seem to be remembering things and she seemed to be a little confused." Significantly, Ann Copelan "did not talk to Mrs. Copelan" about her behavior in the mall, but merely concluded that her conduct was probably a result of "stress" from the "family situation." Importantly, however, evidence was adduced on cross-examination that Mrs. Copelan, on the same occasion at Phipps Plaza, was discussing her

---

[2] She is currently employed by Putnam-Jasper Mental Retardation Center and is supervised by John Copelan, the Director of the Center. At the Center, Ann Copelan performs psychological evaluations among other duties.

estate, estate taxes, and the "division of property" as affecting estate taxes.

Further, Ann Copelan testified that she had engaged in phone conversations with Mrs. Copelan after June 1997, in which Mrs. Copelan seemed confused, had memory loss, and appeared to be deteriorating. Ann Copelan gave no factual examples, and no further evidence was adduced at trial, showing how Mrs. Copelan was confused, exhibited memory loss, or appeared to be deteriorating during these telephone conversations. Again, however, Ann Copelan testified on cross-examination as to the substance of the telephone conversations; a central issue of the conversation was the "tax implications" of her estate. Ann Copelan testified that Mrs. Copelan "did not understand estate tax" and that she "did not know who to go and see."

In addition, Ann Copelan testified that, from a videotape deposition of Mrs. Copelan taken in 1998, she had "diagnosed" Mrs. Copelan as seemingly "suffering a dementia, a disease associated with memory loss and decreased interest in activities as well as herself." This lay opinion was proffered solely on the observance of the videotape in comparison to Ann's past knowledge of Mrs. Copelan; no physical examination or evaluation was conducted, no tests were performed, no written diagnosis was made. She based her opinion on: (1) "all of my experience with persons that I have tested"; (2) "knowing her from the past, . . . and on having seen her in 1996"; and (3) "especially on the videotape deposition." Importantly, the videotape was not entered into evidence so that the jury could view it to determine the weight and credibility of the lay opinion.

Lastly, Ann Copelan testified to Uyvonna's alleged undue influence over Mrs. Copelan. She related an occurrence in June 1997, when John had a stroke. Apparently, Mrs. Copelan wished to visit her son in the hospital, but Uyvonna refused to bring Mrs. Copelan to the hospital.

Mrs. Copelan's sister, Lillie Whitaker, also testified concerning Mrs. Copelan's alleged mental incapacity as well as the alleged undue influence of Uyvonna and Danny. Specifically, Whitaker recounted instances where Mrs. Copelan could independently "drive around." When asked if Mrs. Copelan was a person losing her faculties during those times, Whitaker responded, "not then."

Concerning the alleged undue influence of Uyvonna, Whitaker also testified that a "block" was placed on Mrs. Copelan's phone, allegedly by Uyvonna, after she attempted to contact Mrs. Copelan several times in one day. In addition, Whitaker testified that she last saw Mrs. Copelan at the beauty parlor, but apparently Mrs. Copelan appeared afraid to talk to her because of Uyvonna; however, Uyvonna was not physically present at the hair appointment.

Based on this evidence, a jury verdict was entered on September

22, 2000, in the Superior Court of Putnam County finding that Mrs. Copelan was an incapacitated adult, and that, as such, a guardian should be appointed over both her person and property in accordance with OCGA § 29-5-1. The defendant was denied a directed verdict as well as j.n.o.v., and, thus, Mrs. Copelan appeals the jury verdict. *Held*:

Mrs. Copelan contends that the verdict is not supported by the evidence. We find that the verdict is not supported by clear and convincing evidence and reverse.

> A judge of the probate court may appoint guardians over the person of adults who are incapacitated by reason of mental illness, mental retardation, mental disability, physical illness or disability, chronic use of drugs or alcohol, or other cause, to the extent that such adults lack sufficient understanding or capacity to make significant responsible decisions concerning their persons or to the extent that they are incapable of communicating them.

OCGA § 29-5-1 (a) (1).

> A judge of the probate court may appoint guardians over the property of adults who are incapacitated by reason of mental illness, mental retardation, . . . physical illness or disability, chronic use of drugs or alcohol, detention by a foreign power, disappearance, or other cause, to the extent that such adults are incapable of managing their estates and that the appointment is necessary either because the property will be wasted or dissipated unless proper management is provided or because the property is needed for the support, care, or well-being of such adults or those entitled to be supported by such adults.

OCGA § 29-5-1 (a) (2).

On appeal, the determination of guardianship over a person and property requires a consideration of any evidence under the applicable standard, here clear and convincing evidence, to determine whether the adult is incapacitated as enumerated in OCGA § 29-5-1 (a) (1) and (2). *Kodadek*, supra. In the instant case, appellees rely principally on the testimony of Dr. Paulsen and Ann Copelan which they submit "conclusively demonstrated evidence from which the jury could deduce Evelyn Copelan's mental incapacity." As such, the question for this Court is whether the evidence was clear and convincing such to justify the apparent deduction by the jury; we find that it was not.

The reliance on Dr. Paulsen's testimony does not reach the

threshold of clear and convincing evidence. Dr. Paulsen testified that the most she could say, to any degree of medical certainty, about Mrs. Copelan's mental capacity, after several clinical visits, was that she was "sad" — i.e., she had lost a husband and had children fighting over her property. If anything, Dr. Paulsen's record testimony clearly and convincingly establishes that Mrs. Copelan was clear, lucid, and/ or alert at each visit. At one point, Dr. Paulsen went so far as to declare Mrs. Copelan "alert, oriented . . . non-psychotic." Dr. Paulsen's only concern, as reinforced by her repeated diagnoses and prescriptions, was Mrs. Copelan's state of depression. The seemingly persistent depression and her failure to follow through on medication appear to be what prompted Dr. Paulsen's recommendation for hospitalization, not her mental incapacity. Thus, Dr. Paulsen's expert opinion does not support the verdict.

The unsoundness of mind which will justify an appointment must be more than mere physical disability. *Epperson v. Epperson*, 212 Ga. App. 420 (442 SE2d 12) (1994) (79-year-old man, advanced age and two prior strokes coupled with lack of capacity for responsible decision making such as driving a car against doctor's orders as well as abuse of sleeping pills warranted guardian appointment over person and property); *Doob v. Atkinson*, 232 Ga. App. 471 (500 SE2d 657) (1998) (chronic alcoholism coupled with inability to decide whether to drink alcohol and refusal to take prescribed medicine warranted sustained appointment of guardian ad litem); see also 1977 Op. Atty. Gen. No. U77-65; compare *Jones v. Jones*, 191 Ga. App. 401 (381 SE2d 565) (1989) (affirming the termination of a guardianship after trial court examined medical evidence and conducted face-to-face interview with the ward in which he had an opportunity to observe ward's appearance, speech, and demeanor). The test for mental incapacity is not whether one has merely mismanaged his affairs or is merely unclear in his mind or not bright; rather, "the test is one of capacity — whether the individual, being of unsound mind, could not manage the ordinary affairs of his life." (Citations and punctuation omitted.) *Walker v. Brannan*, 243 Ga. App. 235, 237 (533 SE2d 129) (2000). When Dr. Paulsen was asked if Mrs. Copelan did not know where she was, did not know what she was doing, and whether she could not handle her affairs, Dr. Paulsen responded that her last record visit would not indicate such. Thus, Dr. Paulsen's testimony was contrary to the verdict.

Reliance on Ann Copelan's testimony places appellees' argument on even weaker ground because she testified as a lay person. Ann Copelan had sufficient knowledge, training, and experience to be qualified as an expert, but, at trial, she testified only as a lay witness. A person's state of mind or mental condition is properly the subject of opinion testimony, and after narrating the facts and circum-

stances upon which the conclusion is based, a nonexpert witness may express his or her opinion as to the state of mind or mental condition of another. *O'Kelley v. State*, 175 Ga. App. 503, 507 (3) (333 SE2d 838) (1985). However, a lay witness must "narrate the facts and circumstances upon which his conclusion is based" — i.e., lay a factual foundation for any conclusions; this is the fundamental difference between the opinions of experts and lay witnesses, because the jury must determine from the facts and circumstances whether the lay person had the opportunity to formulate the opinion, and from such facts, judge the weight and credibility of the lay opinion. *Thornton v. Gaillard*, 111 Ga. App. 371, 372 (141 SE2d 771) (1965); *Glover v. State*, 129 Ga. 717, 724 (9) (59 SE 816) (1907).

Ann Copelan's testimony concerning the occurrence at Phipps Plaza, the telephone conversations in 1997, as well as her testimony based on the videotaped deposition, constituted lay testimony about Mrs. Copelan's mental capacity. As such, Ann Copelan's testimony, to be probative, had to be substantiated by laying a proper foundation. At trial, the facts upon which her opinion was based were insufficient. For example, Ann Copelan testified that "I would tell her to meet me at certain places, and she wouldn't be there. And I would have to look to find her." It goes without saying that a myriad of exigencies could provide a reasonable explanation for Mrs. Copelan's absence. However, Ann Copelan did not think it necessary to inquire about Mrs. Copelan's behavior. She merely speculated that her conduct was probably a result of "stress" arising from "the family situation." Thus, Ann Copelan's unsubstantiated conclusion and speculative lay opinion that Mrs. Copelan appeared confused and exhibited memory failure were not probative evidence and should have been disregarded by the jury. While ordinarily the sufficiency of the underlying facts to support the witness's opinion is a jury question, when the reasons stated by the witness are "plainly and indisputably" insufficient, this Court may on review so hold as a matter of law, and a verdict founded upon such evidence should be set aside as being unauthorized. *Whorton v. Boatwright*, 233 Ga. App. 369, 370 (504 SE2d 216) (1998); *Espy v. Preston*, 199 Ga. 608, 609 (34 SE2d 705) (1945) (denial of new trial error because reasons stated by lay witnesses insufficient to support opinion regarding insanity and testamentary capacity).

Notwithstanding the evidentiary problems with Ann Copelan's testimony, the substance of her testimony fails to establish clear and convincing evidence of a lack of mental capacity in Mrs. Copelan. On cross-examination, her testimony that Mrs. Copelan was discussing division of property at Phipps Plaza unequivocally calls into question her prior testimony and, thus, fails to meet the burden of clear and convincing evidence because Mrs. Copelan was aware of her estate,

her children, and her donative intent.

Moreover, Ann Copelan's telephone conversations with Mrs. Copelan in 1997 are subject to the same evidentiary and substantive deficiencies. At trial, Ann Copelan testified that during these telephone conversations Mrs. Copelan "seemed confused, had memory loss and appeared to be deteriorating." Again, this lay testimony was proffered without any factual foundation rendering it nonprobative. *Whorton,* supra; *Espy,* supra. As with the substantive failure of the Phipps Plaza incident, Ann Copelan, again, called her own testimony into question. On cross-examination, she asserted that Mrs. Copelan discussed "tax implications" of her estate; discourse concerning the matters of Mrs. Copelan's estate is clear and convincing evidence of her mental competency, not mental incapacity.

Any reliance on Ann Copelan's apparent diagnosis of Mrs. Copelan based on her observance of a videotape not entered as evidence (neither was the videotape transcript entered) at trial fails. A lay witness must substantiate any opinions with facts admissible as evidence; an opinion based solely on out-of-court hearsay, not subject to any exception to the hearsay rule, is inadmissible. *Carlson v. State,* 240 Ga. App. 589, 590 (2) (524 SE2d 283) (1999) (Even if a witness qualifies as an expert, testimony based solely on hearsay, not subject to a hearsay exception, is inadmissible.); *McEver v. Worrell Enterprises,* 223 Ga. App. 627, 631 (478 SE2d 445) (1996); *Brown v. State,* 206 Ga. App. 800 (427 SE2d 9) (1992) (expert witness testified based on a videotaped deposition not before the court, his testimony was inadmissible hearsay without probative value even in the absence of an objection); *Mallard v. Colonial Life &c. Ins. Co.,* 173 Ga. App. 276 (326 SE2d 6) (1985).

Ann Copelan's "diagnosis" included no physical examination, test evaluation or written diagnosis of Mrs. Copelan, only an observance of a videotape not admitted as evidence. Inasmuch as such diagnosis was based on no more than nonprobative hearsay, the jury could not reasonably assess any weight and credibility of her testimony. As weight and credibility could not be reasonably and fairly assessed in this case, this testimony is deficient as a matter of law. As a result, reliance on Ann Copelan's testimony based on the videotape unequivocally fails to meet the clear and convincing evidence standard required to appoint a guardian over Mrs. Copelan's person and property.

The fatal blow to appellees' argument that the evidence adduced at trial showing Mrs. Copelan's alleged mental incapacity met the clear and convincing standard is the testimony of George Lawrence. Appellees contend that Mrs. Copelan's mental incapacity is shown by the fact that she did not know what she had signed when she executed the survivor deeds in 1997. Appellees' argument flies in the

face of Lawrence's testimony which clearly and convincingly shows Mrs. Copelan to have been competent, fully comprehensive, and in touch with reality when she endeavored to execute the deeds. Despite his acquaintance with Mrs. Copelan for over 50 years, Lawrence would have been obliged to refrain from her request if he had doubt of her mental capacity. Mrs. Copelan's own conduct, in taking one of the deeds to peruse, supports this reasoning.

The lay testimony of Thomas and John Copelan also fails to meet the clear and convincing threshold as their testimony was unsubstantiated and inherently contradictory. On the one hand, they testified to Mrs. Copelan's forgetfulness, mental slipping, and memory failure. On the other hand, however, they testified to Mrs. Copelan's continued and competent bookkeeping and check writing. If anything, their examples provided a clear and convincing foundation for mental competency, rather than mental incapacity.

Apparently in the alternative, appellees assert that clear and convincing evidence of undue influence falls within the parameters of OCGA § 29-5-1. Specifically focusing on the language "or other cause," appellees take an exceptionally broad view of this phrase. Such a broad reading of OCGA § 29-5-1 flies in the face of basic statutory construction, because under the fundamental principle of expressio unius est exclusio alterius, the expression of one thing implies the exclusion of another. OCGA § 29-5-1 (a) and (b) clearly enumerate illnesses or physical condition which determine the test of mental incapacity; undue influence cannot reasonably be placed among the enumerated illnesses or physical condition and, thus, is excluded. The maxim of noscitur a sociis may also be applied in this case. The meaning of the phrase "or other cause" may be ascertained by reference to the list of illnesses that immediately precede and relate to it. Clearly, the enumerated list intends to include medically diagnosable illnesses or physical condition. As such, "or other cause" must be read and understood in this context only. However, undue influence coupled with clear and convincing evidence of mental incapacity could warrant a finding of guardianship over person and property.

Although there is no Georgia guardianship case discussing undue influence as a way of meeting the clear and convincing evidence standard of mental incapacity, there are voluminous cases discussing the same issue in the context of testamentary wills. As this area of law is inextricably related to the legal issues presented in the instant case, it provides fertile ground to determine whether the evidence adduced at trial meets the clear and convincing standard as to undue influence.

Thomas and John testified that if Mrs. Copelan's conduct, with respect to selling the cows, if not due to her alleged mental slippage,

was promulgated by the undue influence of Uyvonna and Danny over Mrs. Copelan: "[Uyvonna and Danny] had absolutely brainwashed her and had beaten that poor woman down until they have sucked every bit of life that she has out of her." Moreover, Thomas and John alleged that Mrs. Copelan was forcefully isolated and cut off from her children. Lilly Whitaker, Mrs. Copelan's sister, testified that Uyvonna allegedly placed a "block" on her phone to preclude any contact with Mrs. Copelan. In the testamentary context, "[t]he law presumes every man to be sane until there is evidence to the contrary, and the burden is on the party attacking a contract to show the incompetency of the signer at the time of the execution thereof." *Jones v. Smith*, 206 Ga. 162, 165 (8) (56 SE2d 462) (1949). Similarly, the burden was on appellees to show incompetency and undue influence.

However, the evidence in the present case indicated that Mrs. Copelan may have been ignorant as to facts or law, lacked interest in business details, had implicit confidence in her children in whose hands she had placed some of her affairs, and even resented the incompetency proceedings because of embarrassment or since she would much prefer shifting responsibility to the shoulders of others than to worry about them herself, this Court cannot conclude that such confusion as appeared from the testimony showed clear and convincing evidence of a mind laboring under difficulty in functioning.

On the contrary, Mrs. Copelan's mind was alert, lucid, and clear. Mrs. Copelan was clearly not subject to such undue influence as to undermine her own free will. *Sims v. Sims*, 265 Ga. 55 (452 SE2d 761) (1995); *Bohler v. Hicks*, 120 Ga. 800, 809 (48 SE 306) (1904) (undue influence is such influence as amounts either to deception or to force and coercion, destroying free agency). Evidence that shows no more than an opportunity to influence falls short of showing the exercise of undue influence. *Brumbelow v. Hopkins*, 197 Ga. 247 (29 SE2d 42) (1944). Nor does honest persuasion or argument constitute undue influence in the absence of fraud or duress when the individual in question has the mental capacity to choose between his original intention and the wishes of the other person. *Morgan v. Ivey*, 222 Ga. 850, 852 (152 SE2d 833) (1967). Moreover, in the context of a will, the testator's choice of one relative rather than another as the favored beneficiary is an insufficient reason alone to deny probate to the will. *Cornelius v. Crosby*, 243 Ga. 26, 28 (252 SE2d 455) (1979). This reasoning should hold true in the context of guardianship. As such, influence is undue "only when it constrains or coerces a person into doing that which his best judgment tells him not to do and deprives him of his free agency and substitutes the will of another

person for his own." 1 Redfearn, Wills & Administration in Georgia, § 50 (S. Love 5th ed. 1988).

Susceptibility to undue influence arising from deep friendship for, or extreme confidence in others, alone, cannot establish clear and convincing evidence of incompetency of the victim unless it is to an extent which deprives the victim of free will; Mrs. Copelan was not subject to such undue influence undermining her own free will. *Sims*, supra. As such, susceptibility to undue influence may be the instrumentality used upon an incompetent victim, but there must be *other independent evidence* of that mental incompetence. Common sense would dictate that strong mentalities are sometimes the victims of undue influence.

In the instant case, the enactment of survivor deeds, while perhaps unfair, does not prove mental incapacity, quite the contrary. Lawrence testified to Mrs. Copelan's coherency, her apparent awareness of reality, and comprehension of the significance of the survivor deeds. Lawrence saw no evidence of duress and would not have drawn up the deeds if he had reason to question her mental capacity.

Moreover, selling the herd of cows, while perhaps imprudent in her children's eyes, does not establish clear and convincing evidence of mental incapacity when the estate was in arrears by approximately $170,000.

Since this Court finds that Mrs. Copelan's mental incapacity was not shown by clear and convincing evidence sufficient to authorize a jury verdict thereon, evidence of susceptibility to undue influence alone is insufficient to meet the clear and convincing standard. Therefore, the verdict in this case cannot be justified under a theory of undue influence.

In the instant case, extensive evidence was proffered in support of Mrs. Copelan's mental competency, and the probative force of this evidence is not to be ignored. The alleged conflicting evidence presented does not create an issue of fact upon which impartial minds may reach different conclusions; rather, the jury relied on testimony that was inadmissible, inappropriate, nonprobative, and/or unsubstantiated. Any verdict founded upon evidence inadmissible as hearsay should be set aside as being unauthorized. *Whorton*, supra; *Espy*, supra; *Kodadek*, supra.

Typically, the jury is necessarily vested with the primary responsibility of determining fact issues. We are and should be guided by the fact that much must necessarily be left, especially in proceedings of this kind, to the sound judgment of the jury and the trial court that have the advantage of being confronted with the witnesses, typically the alleged incompetent person, and the circumstances surrounding the entire proceeding. The trial court clearly is more capable than we of reaching a clear understanding of the situation and of the mental

condition and capacity of the claimed incompetent person.

However, the instant case showed that Mrs. Copelan is not a person of unsound mind, and that there was no clear and convincing evidence to support a finding that her normal mental faculties have deteriorated to the extent that she no longer possesses the degree of mental alertness, stability, and comprehension necessary to avoid the impositions of designing persons, or the waste that results from incompetent management of property as outlined by OCGA § 29-5-1. The evidence is therefore insufficient to justify the jury's finding that a guardian should be appointed over Mrs. Copelan's person and property. As such, we, therefore, need not address appellant's second enumerated error.

Upon review of the trial court's judgment and the entire record, this Court finds that the jury verdict was unfounded as it was based on insufficient and improper evidence which failed to meet the mandated standard of clear and convincing evidence. *Kodadek*, supra.

*Judgment reversed. Andrews, P. J., and Miller, J., concur.*

DECIDED JULY 31, 2001 — 

*Lambert & Roffman, E. R. Lambert, M. Joseph Reitman, Jr., Barry B. McGough*, for appellant.

*Adam R. Gaslowitz & Associates, Adam R. Gaslowitz, Walter Hamberg III, Duane D. Pritchett*, for appellee.